IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 25, 2012

## STATE OF TENNESSEE v. MICHAEL JARVIS SHIPP

**Appeal from the Circuit Court for Maury County**
**No. 2010-CR-20158      Robert L. Jones, Judge**

---

**No. M2011-01876-CCA-R3-CD - Filed August 31, 2012**

---

A grand jury indicted appellant, Michael Jarvis Shipp, for one count of first degree murder and one count of especially aggravated robbery. A jury found him guilty of first degree murder and the lesser-included offense of aggravated robbery, for which the trial court imposed concurrent sentences of life and eight years, respectively. On appeal, appellant challenges the sufficiency of the convicting evidence underlying both counts. We find that the evidence was sufficient to convict appellant on both counts and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Robert C. Richardson, Jr., Columbia, Tennessee, for the appellant, Michael Jarvis Shipp.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; T. Michel Bottoms, District Attorney General; and Kyle Dodd and Patrick Powell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### A. Procedural History

A Maury County Grand Jury indicted the seventeen-year-old appellant for one count of first degree murder and one count of especially aggravated robbery for his participation in the crimes against Howard Baugh on April 1, 2010. The juvenile court held a detention

hearing on April 5, 2010, and ordered detainment and a psychiatric examination pending trial. On April 7, 2010, the State filed a motion to transfer appellant to circuit court to be tried as an adult. The juvenile court granted the State's motion on August 24, 2010.[1] Prior to trial, appellant filed a notice of intent to raise self-defense as a defense to his participation in the shooting. Following a two-day trial, the jury found appellant guilty of first degree murder and the lesser-included offense of aggravated robbery. The trial court sentenced appellant to concurrent sentences of life for the murder conviction and eight years for the aggravated robbery conviction. The trial court denied appellant's motion for a new trial, and this appeal follows.

## B. Facts

Lieutenant Bill Denton with the Columbia Police Department testified that on April 1, 2010, he responded to a call involving a shooting at 154 Morningside Lane. While driving to the location, he noticed a black Dodge Charger on the roadway. The vehicle caught his attention because it appeared unique; the car was solid black with black wheels and black windows. When Lieutenant Denton arrived at the scene, a black male was lying in the driveway and another individual was outside with him. Upon further inspection, he observed that the black male on the ground was the victim of the shooting and recognized him as Howard Baugh. Lieutenant Denton could not locate a pulse for the victim but nonetheless initiated CPR until medical personnel arrived. As other officers arrived, they attempted to secure the crime scene and gather as much evidence as possible before paramedics and other emergency responders disturbed the scene. Lieutenant Denton collected bullet casings he found beside the victim's body. He later learned that the two suspects had fled the scene in the black Dodge Charger he had noticed earlier.

Dr. Bridget Eutenier, an assistant medical examiner, testified as an expert witness in the field of forensic pathology. She stated the victim suffered nine gunshot wounds (six entry wounds and three exit wounds) and several blunt force trauma injuries. She recovered three projectiles from the victim's body. Dr. Eutenier testified that the gunshots were fired from an indeterminate range and that she could not ascertain the order in which the gunshot wounds were inflicted. She concluded that the manner of death was homicide, and the cause of death was multiple gunshot wounds. The fatal injuries were a gunshot wound that eventually lodged in the victim's spine and a gunshot wound to the chest, which affected his heart and both lungs. Dr. Eutenier further stated the victim was alive when each of the wounds was inflicted.

---

[1] The State filed a motion in circuit court to consolidate appellant's trial with co-defendant Jonathan Martin's trial, which the court granted. However, the transcript bears no indication that the co-defendant was tried during the same proceedings.

Carissa Stone testified that the victim was her boyfriend and the father of her son. She told the jury that on April 1, 2010, the victim took her in a black Dodge Charger to Tiffany Conger's house on Morningside Lane to dye Easter eggs. Several adults, including appellant, and three children were also present. At some point, Ms. Stone's brother gave her a telephone charger, which she placed on a table. Subsequently, the victim returned to Ms. Conger's home, and Ms. Stone left with him, leaving the charger on the table. A short time later, the victim brought Ms. Stone back to Ms. Conger's house and left. When Ms. Stone re-entered Ms. Conger's house, the telephone charger was not on the table. She noticed that appellant was in possession of the same kind of charger, so she asked him if it was her charger. They "exchanged words," and Ms. Stone called the victim to tell him that appellant would not return her telephone charger. Shortly thereafter, two people who had been in a different room approached Ms. Stone and returned her charger to her. Upon learning that the cellular telephone charger that had been in appellant's possession was not her charger, Ms. Stone apologized to appellant. Appellant told her, "I don't accept apologies." She then called the victim and told him not to come to Ms. Conger's house. The victim arrived at Ms. Conger's house despite Ms. Stone's telling him that he did not need to return. At that time, Ms. Stone began to gather her child's belongings so they could leave with the victim.

The victim parked his car on the street in front of Ms. Conger's house. Ms. Stone went outside to speak with him. As she was explaining to the victim that his return was not necessary, he told Ms. Stone that he wanted to speak with appellant and "diffuse the situation." Simultaneously, appellant stepped outside and sat on the back of a car that was parked in the driveway. The two vehicles were approximately fifteen feet apart. The victim told Ms. Stone to ask appellant to walk to his vehicle and talk with him. Appellant said, "No. Tell him to come here." The victim exited his vehicle and walked over to appellant. Ms. Stone stated that the victim did not appear to be angry and was not carrying a weapon. Ms. Stone walked inside the house to get her son so they could leave. While inside, she did not hear the men's voices at all. They were not shouting or yelling. Ms. Stone was in the process of placing her son in his car seat when she heard three gunshots in rapid succession. She began to scream and "hit the floor." She waited for the sound of more shots but did not hear any more. She stood up, and appellant walked through the door. He approached Jonathan Martin, who was inside the house, and said, "Give me the strap, cuz, so I can finish this [expletive] off." Martin handed appellant a gun. Appellant walked back outside. Ms. Stone then heard two more gunshots. She stayed inside and waited for appellant to leave. When she saw appellant drive away in the victim's black Dodge Charger, she went outside to check on the victim. He was lying on his stomach in the driveway. She observed blood all over his back. Ms. Conger called 9-1-1. Ms. Stone thought that the victim was conscious. His eyes were open but were beginning to roll back in his head. While waiting on the ambulance, Ms. Stone and others placed blankets and towels on the victim and tried to put

pressure on his wounds. She accompanied the victim in the ambulance as he was transported to the hospital.

Charles Stone, Carissa Stone's brother, testified that on April 1, 2010, he was visiting Columbia, Tennessee, from Chicago, Illinois, and was "catching up" with people he had not seen since moving to Chicago. He was visiting with people at Ms. Conger's house at 154 Morningside Lane. While there, he witnessed the argument between his sister and appellant. Mr. Stone testified that the argument involved a misplaced cellular telephone charger. He told the jury that it was a misunderstanding and that Ms. Stone apologized to appellant when she located her charger. He heard the victim's car pull up to the house and saw Ms. Stone walk outside. Shortly thereafter, appellant followed her outside. Thirty seconds to one minute later, Ms. Stone re-entered the house. At the time, Mr. Stone was seated in the living room area holding his nephew.

After several minutes passed, Mr. Stone thought that "it was too quiet" outside so he walked out of the front door to see what was happening in the front yard. He looked to the left side of the house where the driveway was located and, not seeing anything, stepped back inside. As he was walking back to the living room, he heard three gunshots. Upon hearing gunshots, Mr. Stone ran toward the back door. He circled around the rear of the house to the driveway area and saw the victim lying on the ground. Mr. Stone observed that the victim had been shot and was having a difficult time moving. He attempted to render aid to the victim. As he was doing so, he looked toward the front of the house and saw appellant walking toward them holding a gun. Mr. Stone fled toward the back of the house. When Mr. Stone saw appellant moving closer to the victim, he moved closer to observe the next events. He saw appellant load the weapon and heard him say, "This is for my [expletive]. I know you had something to do with it." The victim protested and tried to crawl toward the house, but appellant shot him two more times. When Mr. Stone heard car doors closing, he believed that appellant was leaving, so he rushed to the victim. He yelled for someone inside of the house to call 9-1-1. He attempted to apply pressure to the victim's gunshot wounds. Mr. Stone remained with the victim until police arrived. He testified he and the victim were very close friends.

Katricia Lowery testified her daughter was the victim's first cousin. Ms. Lowery owned the 2008 black Dodge Charger the victim was driving. The victim was going to have the car cleaned for Ms. Lowery while she was at work on the day of the shooting. The victim did not return the vehicle on the day he borrowed it; she received the car the following day from a police detective. The front end of the vehicle was "messed up," and the stereo and "GPS" had been stolen.

-4-

Detective Scott Knudson with the Columbia Police Department was the detective on duty on the night of the shooting. Pursuant to the emergency call from the dispatcher, he responded to the scene at Morningside Lane. When he arrived, officers had cordoned off the scene with crime scene tape and had begun to place evidence markers. He first noted blood in the driveway; however, the victim had been transported to the hospital. Detective Knudson obtained statements and information pertaining to the victim. He believed that police knew who the suspects were, so he had the intelligence unit begin "work-ups," including criminal histories, gang affiliations, and driving records. He then traveled to the hospital where he spoke with a charge nurse. She directed him to a trauma room where the victim's body was located.

Detective Knudson testified that during the investigation, officers recovered six shell casings, three .45 caliber casings, and three nine millimeter casings. They did not recover any weapons. The black Dodge Charger was not located at the scene but was later recovered by officers from the narcotics and vice division of the department.

Columbia Police Department Detective Brian Goats testified that he responded to the location on Morningside Drive pursuant to a call from dispatch. When he arrived, patrol officers had secured the scene with crime scene tape. He began taking photographs without evidence markers, then placed the markers and photographed the areas a second time. He also obtained measurements from fixed points to the pieces of evidence. As he processed the scene, Officer Jonathan Stotler worked on a rough crime scene sketch. They also obtained fingerprints and took DNA swabs from automobiles, particularly around the door handles. Detective Goats recalled specifically that among the items of evidence collected were two .45 caliber shell casings, several blood-soaked towels, two shoes (one child's shoe and one adult's shoe), and a beer can. None of the items of evidence collected incriminated appellant in the offenses.

Sergeant Jeremy Haywood, also from the Columbia Police Department, testified that on April 2, 2010, he received, via dispatch, an anonymous telephone call providing him with information regarding appellant's whereabouts. The caller told him to investigate a location on White Street. Sergeant Haywood and other officers traveled in that direction and observed a male who matched appellant's general description in terms of body size and build. As Sergeant Haywood approached, he turned his spot light on the man and could see that it was appellant. He and the officers exited their vehicles and gave appellant verbal commands to stop and place his hands where officers could see them. As they placed appellant under arrest, individuals whom Sergeant Haywood believed to be appellant's family approached. Appellant spontaneously told officers that "he had nothing to be sad about, wasn't sorry for anything." Officer Jesse Lovett transported appellant to the detectives' division of the Columbia Police Department.

Sergeant Jeff Duncan, a detective with the Columbia Police Department, testified that he was dispatched to the location at Morningside Drive. Once there, he gathered a few of the witnesses and asked them to go to the police department for interviews. In addition to the witness interviews, Sergeant Duncan interviewed appellant the following day. He administered *Miranda* warnings to appellant, and appellant initialed the form indicating that he understood his rights.

As Sergeant Duncan began the interview, appellant immediately stated he was not present at the scene. Sergeant Duncan informed appellant that several witnesses placed him at the scene. Sergeant Duncan then asked appellant if he was ever in fear on the night in question, to which appellant responded affirmatively. Appellant then recounted the argument with Ms. Stone over the cellular telephone charger and how she had called her boyfriend, the victim, to come to the house. He told Sergeant Duncan that when the victim arrived, Ms. Stone went outside to speak with him, and appellant walked outside soon thereafter and sat on a nearby vehicle. He confirmed that the victim called him over, that Ms. Stone went back inside the house, and that the victim then walked toward him. Appellant told Sergeant Duncan that he and the victim "exchanged words" over the argument involving the telephone charger and that the victim became disturbed when appellant called Ms. Stone "[s]ome unflattering names." Appellant stated that at that point, the victim grabbed him and threw him to the ground, and that while on the ground, appellant saw a pistol lying on the ground. Appellant's theory was that the gun must have fallen from the victim when the victim threw him to the ground. He explained that while he was on the ground, the victim was still approaching him, so he grabbed the pistol and fired three to four times.

Appellant originally told Sergeant Duncan that after he fired the initial shots, he drove away in the victim's automobile. He later admitted that another person, Jonathan Martin, was with him when he drove away. Although Sergeant Duncan questioned appellant about the second set of shots, he could not give an answer. Appellant said he threw the gun into the woods adjacent to the location where officers recovered the abandoned vehicle. Officers searched but did not recover a weapon. Appellant admitted stealing the radio from inside the car and selling it to an unknown black male. Appellant's written statement was admitted into evidence at trial.

The State next called Special Agent Robert Royse, assistant director of the Tennessee Bureau of Investigation Crime Laboratory in Nashville, Tennessee. The trial court accepted Special Agent Royse as an expert in forensics, specifically in the areas of ballistics and tool mark identification. He testified that he examined three nine millimeter cartridge cases, three .45 caliber automatic cartridge cases, a sleeveless undershirt, a white t-shirt, and three fired bullets that were recovered from the victim's body. Based on his examination and comparison, Special Agent Royse ascertained that the three nine millimeter cartridge cases

were fired from the same weapon. Furthermore, the three .45 caliber automatic cartridge cases were fired from the same weapon. He explained to the jury that one could not fire a .45 caliber shell from a nine millimeter weapon, and that therefore, two weapons were used. Based on the condition of the sleeveless undershirt and the white t-shirt worn by the victim, he could not ascertain the distance from which the shots were fired. Special Agent Royse also examined three bullets, one nine millimeter and two .45 caliber bullets, that were removed from the victim. He concluded, based on his examination of the recovered bullets, that the two .45 caliber bullets were fired from the same weapon.

Appellant called Officer Jason Terlecki with the Columbia Police Department as a witness. Officers Terlecki and Jonathan Stotler were the first officers to arrive at the scene of the shooting at 10:27 p.m. Officer Terlecki first noticed that the victim had been shot and was lying face down on the pavement. He checked the victim's pulse and, finding none, he began CPR. The victim remained unresponsive. Paramedics continued to attempt to revive the victim when they arrived.

Appellant also called Officer Jonathan Stotler, who testified that when he and Officer Terlecki approached the victim, he did not appear to be breathing. He also observed a black male whom he later identified as Charles Stone walking around in an agitated state. Mr. Stone gave Officer Stotler a written statement after he calmed down. Mr. Stone wrote that following the first set of shots, appellant went to a vehicle and retrieved the second weapon. Mr. Stone neglected to write down the fact that he walked outside through the front door prior to the shooting and did not see or hear anything. Mr. Stone's statement did not include his hearing appellant load or "rack" the gun, as he testified at trial.

## C. Analysis

The sole issue for our consideration on appeal is whether the State presented sufficient evidence by which the jury could convict appellant of first degree murder and aggravated robbery.

### 1. Standard of Review

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of

the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## 2. Sufficiency of the Evidence: First Degree Murder

The fact that appellant shot the victim is undisputed. The crux of appellant's argument focuses on two distinct issues: his affirmative defense of self-defense and the specious evidence connecting him with the second set of gunshots sustained by the victim. In appellant's statement, he told the detective that the victim threw him to the ground where he saw a weapon, then fired at the victim because the victim was coming toward him again. Appellant argues that "self-defense was available . . . under the proof put forth by the State and should have been so received by the jury." Mr. Stone testified that he witnessed appellant fire the second set of gunshots toward the victim. Appellant argues that "[f]or the jury to give the State's theory weight . . . they had to find Charles Stone credible."

Ms. Stone testified that appellant and the victim were standing outside of the house talking when she walked back inside. Moments later, she heard several gunshots, witnessed appellant come inside the house where he obtained a second weapon, and after he went back outside, heard several additional gunshots. Mr. Stone testified that appellant and the victim

-8-

were outside talking, and when he noticed that it was "too quiet" outside, he stepped outside through the front door to check on matters and saw no one. Shortly thereafter, he was sitting in the living room of the house, heard gunshots, ran around the house to the driveway by way of the back door, and witnessed appellant, who was holding a gun, approach the victim and fire additional shots toward him. In his statement to law enforcement, appellant admitted firing three to four rounds at the victim.

Both of appellant's arguments raise questions of fact for the jury. In rendering a guilty verdict on the charge of first degree murder, the jury rejected appellant's affirmative defense. Moreover, the jury obviously credited the testimony of Charles Stone over appellant's statement. In doing so, the jury resolved questions of credibility of witnesses and factual disputes raised by the evidence. *See Bland*, 958 S.W.2d at 659. We will not re-evaluate the inferences drawn from the evidence by the jury or re-weigh the evidence. *See Dorantes*, 331 S.W.3d at 379.

Viewing the evidence in the light most favorable to the prosecution, the State presented sufficient evidence by which to sustain appellant's conviction of first degree murder. Appellant has failed to carry his burden of proving otherwise. He is not entitled to relief on this issue.

### 3. Sufficiency of the Evidence: Aggravated Robbery

Appellant was indicted for especially aggravated robbery, and the jury found him guilty of the lesser-included offense of aggravated robbery. Appellant asserts that the jury could not have logically found that the State's evidence established the element of "taking by fear or violence" because he stole the automobile after the victim was deceased.

To establish the offense of aggravated robbery, the State must prove that appellant intentionally or knowingly committed theft of property from the victim by violence or by putting him in fear *and* that appellant accomplished the theft with a deadly weapon *or* "by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" *or* "where the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401, -402 (2010).

In a similar case, we have previously held:

> [Appellant] also contends that the [property] could have been stolen after the death of the victim; [appellant] argues that the requisite element of "forcible taking . . . by violence or putting the person in fear" is missing. . . .

Given the continuing nature of these crimes, the time of the robbery in relation to the point at which the victim died is irrelevant.

Even if the victim's death occurred prior to the robbery, we think the requisite elements of the offense are present. If [appellant] did not put the victim in fear, he certainly participated in the "violence" against the victim either before, during, or after the robbery. The statute provides that this element of the crime may be proved by "violence or putting the person in fear." One or both were present in this instance.

In short, we find no merit to [appellant's] argument.

*State v. Robert Roger Brewington, Jr.,* No. No. 89-232-III, 1990 WL 83406, at *3 (Tenn. Crim. App. June 20, 1990) (internal citations omitted). Consistent with our prior opinion, we find that appellant is not entitled to relief on this issue.

As an alternative argument, appellant contends that the jury could not have found that he had the intent to deprive the owner of the property because he abandoned the automobile and police recovered it in close proximity to the crime scene in "relatively pristine condition." We reject this argument. Clearly, appellant had the intent to deprive the owner of the property when he left the crime scene in the automobile. The fact that he soon abandoned the vehicle is irrelevant to his intent at the time he stole the car. Furthermore, the State presented evidence that the radio and "GPS" had been removed from the vehicle, indicating a further intent to deprive the owner of property. The owner of the automobile testified that the front end of the car was "messed up" when it was returned to her. Viewing the evidence in the light most favorable to the prosecution, the State presented sufficient evidence by which to sustain appellant's conviction of aggravated robbery. Appellant has failed to carry his burden of proving otherwise. He is not entitled to relief on this issue.

## CONCLUSION

After careful review of the parties' briefs and the entire record, we find no error and affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE